JOURNAL ENTRY and OPINION
{¶ 1} Defendant-appellant, Ganley Dodge, Inc. ("Ganley"), appeals the trial court's decision granting judgment in favor of plaintiff-appellee, Donald M. Elliott ("Elliott"), as Trustee under the Trust Agreement dated August 9, 1963. Finding merit to the appeal, we reverse and remand for the entry of judgment for Ganley on its counterclaim.
 {¶ 2} In May 2003, Elliott filed a complaint alleging that Ganley breached the terms and conditions of its lease by failing to restore various items on the premises, specifically automobile lifts, heaters, and air compressors. In claim two of Elliott's complaint, he recognized that because Ganley had prepaid the rent for November 2001 and vacated the premises on November 15, Ganley was entitled to a setoff of $3,838.68. Ganley filed a counterclaim for the $3,838.68 in prepaid rent.
 {¶ 3} Each party's motion for summary judgment was implicitly denied when the trial court conducted a hearing on the matter at which the following evidence was presented.
 {¶ 4} In 1978, Elliott and Ganley entered into an Agreement of Lease ("Lease") for the premises at issue. The Lease was subsequently renewed in 1992/1993, with termination scheduled in December 2002. Pursuant to Article VI, Paragraph 1, Ganley agreed to maintain the premises in "as good condition and repair as at the beginning of the term hereof."
 {¶ 5} In 2001, Ganley contacted Elliott to terminate the Lease early. Elliott then contacted the City of Bedford ("City") to inspect the premises in order to determine what repairs were needed. In August 2001, the City and Elliott inspected the premises. Elliott claimed that they were unable to inspect the automobile lifts because cars were on them. He admitted that they did not inspect the overhead heaters because "[I]t was fall. It was warm. We had no reason to look at or ask questions about overhead heaters, which were in the service department." They also did not inspect the back room because it was filled with automobile and truck parts. Rick Heller ("Heller"), Ganley's general manager, testified that he was not contacted regarding the inspection, nor did he meet with the City inspector or Elliot during the inspection.
 {¶ 6} The City issued a Certificate of Inspection ("Certificate"), noting approximately 21 repairs that were needed. The Certificate did not mention any problem with the automobile lifts, heaters, or air compressors.
 {¶ 7} In October 2001, Elliott met with Jonathan Berns ("Berns"), an employee of The Structure Group, which Ganley hired to repair the cited violations, and John Hochberg, the project manager for The Structure Group. At the meeting, they discussed the repairs that were to be made to the premises. Berns testified that, "It was very vague in what repairs were to be done. And then we discussed using the inspection as one way of identifying in a concrete manner what the repairs were to be done." He further testified that he and Elliot walked around the property on several occasions. Heller testified that at the meeting, no one indicated that the heaters or lifts needed repair or inspection.
 {¶ 8} As a result of the meeting, a Lease Termination and Mutual Release Agreement ("Release") was executed by both parties in November 2001. The Release recognized that "disputes exist between the parties concerning the scope of their respective obligations to make the repairs to the Properties sought by the City and similar repairs." The Release provided that Ganley would make all repairs indicated in the Certificate as well as deliver the property to Elliott "in the condition required under the terms of the Lease." In return, Elliott allowed Ganley to terminate the Lease prior to the termination date.
 {¶ 9} The Release further provided that Elliott release and hold Ganley harmless "from any and all claims, demands, causes of action, liabilities, damages, attorneys' fees and expenses, whatsoever, whether in law or equity, whether known or unknown, which such party may now have or which such party may have in the future, including, but not limited to, any and all claims whatsoever relating to Lessee's use or occupation of the Properties and any and all obligations under the Leases other than those set forth in paragraph 2 hereof."
 {¶ 10} The Structure Group began work on the premises in late fall 2001. All projects were completed by November, except for asphalt repair, which was postponed until early summer 2002. In July 2002, after all violations were corrected, Elliott signed an Acknowledgment recognizing that Ganley had fulfilled all of its obligations under the Release.
 {¶ 11} The trial court granted judgment in favor of Elliott. Although not specifically stated in its judgment entry, we presume that it granted Elliott's second claim and Ganley's counterclaim because the total judgment was set off by Ganley's counterclaim of $3,838.68, leaving a final judgment for Elliott in the amount of $6,192.45. Neither party has appealed the disposition of Elliott's second claim and Ganley's counterclaim.
 {¶ 12} Ganley appeals the trial court's decision, raising two assignments of error, which will be addressed together.
 {¶ 13} In its second assignment of error, Ganley argues that the trial court committed reversible error in ruling that the Acknowledgment was invalid and that the Release was presumably void or invalid. Because of such error, Ganley argues in its first assignment of error that the trial court should have granted its motion for summary judgment.
 {¶ 14} Appellate review of summary judgment is de novo. Grafton v.Ohio Edison Co., 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241;Zemcik v. La Pine Truck Sales Equipment (1998), 124 Ohio App.3d 581,585, 706 N.E.2d 860. The Ohio Supreme Court set forth the appropriate test in Zivich v. Mentor Soccer Club, 82 Ohio St.3d 367, 369-370,1998-Ohio-389, 696 N.E.2d 201, as follows:
Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp., 73 Ohio St.3d 679, 1995-Ohio-286,653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107,662 N.E.2d 264.
 {¶ 15} Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); Mootispaw v. Eckstein,76 Ohio St.3d 383, 385, 1996-Ohio-389, 667 N.E.2d 1197. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg,65 Ohio St.3d 356, 358-359, 1992-Ohio-95, 604 N.E.2d 138.
 {¶ 16} Ganley maintains that it was entitled to summary judgment because all of its obligations pursuant to the Release were fulfilled, as recognized and confirmed by Elliott in the July 2002 Acknowledgment.
 {¶ 17} The issues before this court are whether the Release prevented Elliott from pursuing any subsequent claim against Ganley, and whether the Acknowledgment constituted Elliott's final "release" of Ganley in satisfaction of the terms of the Release.
 {¶ 18} Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130, 509 N.E.2d 411. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. Alexander v. Buckeye Pipe Line Co.
(1978), 53 Ohio St.2d 241, 246, 374 N.E.2d 146. The test for determining whether contract terms are ambiguous is "common words appearing in a written instrument are to be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Id. at paragraph two of the syllabus.
It is a general rule as to the binding effect of contracts that in the absence of fraud or mutual mistake, a party who executes a written contract cannot say that he was ignorant of its contents and thus escape liability, * * * It is well-established principle that it is the duty of every person who enters into a contract, to learn its contents before he signs it. A party cannot shut his eyes and sign a contract and then ask to be relieved from its plain terms merely because he did not know what it contained. Contracts would have little force and effect if they could be set aside upon such ground. Rice v. Rice (Nov. 8, 2001), Cuyahoga App. No. 18682, quoting Kiel v. Circuit Design Technology, Inc. (1988),55 Ohio App.3d 63, 66, 562 N.E.2d 517, 520.
 {¶ 19} A release is a contract which requires an offer, acceptance, and a meeting of the minds in order to be valid. Noroski v. Fallet
(1982), 2 Ohio St.3d 77, 79, 442 N.E.2d 1302. Here, the Release was signed by both parties and possessed the requisite consideration. Giving the terms of the Release their ordinary meaning, the Release indicated unambiguously the intent of the parties to release Ganley from fulfilling the terms of the Lease in exchange for correcting all violations set forth in the Certificate. The Release further provided that Ganley was to return the premises "in the condition required under the terms of the Lease." Moreover, it is undisputed that the Release is a valid contract.
 {¶ 20} Finding the Release enforceable, we must next determine the effect of the July 2002 Acknowledgment. Elliott claims that he signed the Acknowledgment admitting that The Structure Group corrected all the violations which the City cited. However, he claims that, because the Acknowledgment was prepared and presented by The Structure Group, it bears no legal significance. We disagree.
 {¶ 21} The Acknowledgment unambiguously stated that Elliott agreed that Ganley, not The Structure Group, "fulfilled all of its obligations under the Lease Termination and Mutual Release Agreement." Merely because The Structure Group prepared the document does not minimize the legal significance of the Acknowledgment. In fact, it is undisputed that the Structure Group also drafted the Release, which both parties signed and Elliott does not contest. We find no evidence of fraud or mutual mistake, which would require our finding the Acknowledgment to be unenforceable.
 {¶ 22} The evidence presented at trial demonstrates that the automobile lifts, heaters, and air compressors were never inspected by the City or Elliott and that Elliott knew about the condition of these items prior to signing the Acknowledgment. In fact, Elliott had knowledge of these items as early as December 2001, when he had them repaired. Berns and Heller both testified that Elliott contacted them prior to July 2002 inquiring about the fixtures in question, yet Elliott still signed the Acknowledgment. If the issues regarding the automobile lifts, heaters, and air compressors were still unresolved, Elliott should not have signed the Acknowledgment agreeing that Ganley had fulfilled its obligations under the Release.
 {¶ 23} The Acknowledgment was essentially a receipt given by Elliot recognizing that Ganley had "fulfilled all of its obligations under the Lease Termination and Mutual Release Agreement." Therefore, because the Release incorporated the terms of the Lease, by signing the Acknowledgment, Elliott agreed that Ganley fulfilled all of its obligations with respect to the premises. At the time of the Acknowledgment, Ganley had vacated the premises and fulfilled all obligations under the Release. Pursuant to the terms of the Release, Ganley was released from any and all future claims whether "known or unknown."
 {¶ 24} The plain language of the Acknowledgment does not create any issue of material fact, nor has Elliott demonstrated that the Release and the Acknowledgment were signed under fraud or mutual mistake. Consequently, the trial court erred in failing to grant Ganley's motion for summary judgment because Elliott admitted that Ganley fulfilled all its obligations under the Release by signing the Acknowledgment.
 {¶ 25} Accordingly, Ganley's assignments of error are sustained.
 {¶ 26} Judgment for Elliott reversed. Because no appeal has been taken regarding the setoff reflected in Ganley's counterclaim, case remanded for entry of judgment for Ganley on its counterclaim in the amount of $3,838.68.
Blackmon, A.J. and Corrigan, J. concur.